1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOSEPH GERMINO,

11              Petitioner,              No. CIV S-08-3010 JAM DAD P

12        vs.

13   JOHN MARSHALL,

14              Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding pro se with an amended petition for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  In his amended habeas petition before this court

18   petitioner challenges his 2004 judgment of conviction entered in the Amador County Superior

19   Court for attempted murder in violation of California Penal Code § 187(a), assault by means of

20   force likely to produce great bodily injury in violation of California Penal Code § 245(a)(1),

21   kidnapping in violation of California Penal Code § 207(a), second degree robbery in violation of

22   California Penal Code § 211, false imprisonment by violence in violation of California Penal

23   Code § 236, aggravated mayhem in violation of California Penal Code § 205, and unlawfully

24   driving or taking a vehicle in violation of California Vehicle Code § 10851(a).

25              Petitioner seeks federal habeas relief on the grounds that: (1) his private diaries

26   were illegally seized and admitted into evidence at his trial; (2) his conviction was based solely

1

1   on the illegal admission of his private diaries into evidence; (3) his "vicinage rights" were

2   violated; (4) his trial counsel rendered ineffective assistance; (5) his right to a fair trial was

3   violated by prosecutorial misconduct; (6) his appellate counsel rendered ineffective assistance;

4   and (7) he was improperly sentenced.

5          Upon careful consideration of the record and the applicable law, the undersigned

6   will recommend that petitioner's application for habeas corpus relief be denied.

7                              PROCEDURAL BACKGROUND

8          On January 20, 2004 an Amador County Superior Court jury found petitioner

9   guilty of attempted murder, assault, kidnapping, robbery, false imprisonment, aggravated

10  mayhem, and vehicle theft.  (Notice of Lodging Documents on April 1, 2009 (Doc. No. 14),

11  Clerk's Transcript on Appeal (CT) at 570-77.)  Additionally the jury found enhancement

12  allegations for inflicting great bodily injury and the use of a deadly or dangerous weapon  to be

13  true.  (Id. at 578-79.)  Following his conviction, petitioner was sentenced on March 1, 2004, to

14  state prison for an indeterminate term of life with the possibility of parole, plus a determinate

15  term of 13 years.  (Id. at 634-37.)

16         Petitioner appealed his judgment of conviction to the California Court of Appeal

17  for the Third Appellate District.  On May 26, 2006, the judgment of conviction was affirmed in a

18  reasoned opinion.  (Resp't's Lod. Doc. 4.)  Petitioner then filed a petition for review with the

19  California Supreme Court.  (Resp't's Lod. Doc. 5.)  On September 13, 2006, the California

20  Supreme Court summarily denied that petition.  (Resp't's Lod. Doc. 6.)

21         On November 21, 2007, petitioner filed a petition for writ of habeas corpus in the

22  California Supreme Court.  (Resp't's Lod. Doc. 7.)  That petition was summarily denied on May

23  14, 2008.  (Resp't's Lod. Doc. 8.)  Petitioner thereafter filed a petition for writ of habeas corpus

24  in the Amador County Superior Court on February 9, 2007.  (Resp't's Lod. Doc. 9.)  The

25  Amador County Superior Court denied that petition in reasoned opinions on June 27, 2007 and

26  /////

1   October 15, 2007.[1]  (Resp't's Lod. Doc. 10, 13.)  On October 25, 2007, petitioner filed a petition

2   for a writ of habeas corpus in the California Court of Appeal for the Third Appellate District.

3   (Resp't's Lod. Doc. 11.)  That petition was summarily denied on November 1, 2007.  (Resp't's

4   Lod. Doc. 12.)

5            On December 11, 2008, petitioner filed his original petition for a writ of habeas

6   corpus in this court.  (Doc. No. 1.)  Thereafter, on December 24, 2008, petitioner filed the

7   amended petition now before the court.  (Doc. No. 5. - "Am. Pet.")  Respondent filed an answer

8   on April 1, 2009.  (Doc. No. 15 - "Answer.")  Petitioner filed his traverse on June 22, 2009.

9   (Doc. No. 20 - "Traverse.")

10                                    FACTUAL BACKGROUND

11           In its unpublished memorandum and opinion affirming petitioner's judgment of

12   conviction, the California Court of Appeal for the Third Appellate District provided the

13   following factual summary:

14           Defendant bludgeoned the victim with a manzanita club in the
             mobile home they shared in Columbia, a town located in Tuolumne
15           County.  Defendant took the keys to the mobile home, which the
             victim owned, and drove it to Reno, Nevada.  While passing
16           through Amador County, defendant dumped the victim's body on a
             turnout off Highway 49.  The victim survived the attack, but
17           suffered permanent injuries.

18           A jury convicted defendant of attempted willful, deliberate and
             premeditated murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a)-
19           subsequent undesignated statutory references are to this Code),
             assault by means of force likely to produce great bodily injury (§
20           245, subd. (a)(1)), kidnapping (§ 207, subd. (a)), robbery (§ 211),
             false imprisonment by violence (§ 236), aggravated mayhem (§
21           205), and vehicle theft (Veh. Code, § 10851, subd. (a)), as well as
             multiple enhancements for great bodily injury (§ 12022.7, subd.
22           (a)) and use of a deadly or dangerous weapon (§ 12022, subd.

23   _____

24        [1] In its June 27, 2007 opinion the Amador County Superior Court rejected all but one of
     petitioner's state habeas claims.  As to the remaining claim that the trial court improperly
25   imposed an aggravated term at the time of sentencing, that court ordered respondent to file a
     return to the petition.  (Resp't's Lod. Doc. No. 10.)  Respondent did so and on October 15, 2007,
26   the Amador County Superior Court rejected petitioner's sentencing claim.  (Resp't's Lod. Doc.
     No. 13.)

                                              3

1   (b)(1)).  The court imposed concurrent terms of life with the
possibility of parole for the attempted murder and aggravated
2   mayhem convictions, but imposed a section 654 stay on the latter.
The court imposed a concurrent upper term sentence for the section
3   245, subdivision (a)(1) conviction, but issued a section 654 stay of
this sentence as well.  Defendant's aggregate sentence consisted of
4   an indeterminate term of life with the possibility of parole plus a
determinate term of 13 years.

5

6   (Resp't's Lod. Doc. 4 at 2 (hereinafter Opinion).)

7                                   ANALYSIS

8   I.  Standards of Review Applicable to Habeas Corpus Claims

9          A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

10  some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

11  861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

12  Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

13  interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

14  Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas

15  corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377

16  (1972).

17         This action is governed by the Antiterrorism and Effective Death Penalty Act of

18  1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

19  1062, 1067 (9th Cir. 2003).  Title 28 U.S.C. § 2254(d) sets forth the following standards for

20  granting habeas corpus relief:

21                An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court shall
22                not be granted with respect to any claim that was adjudicated on
the merits in State court proceedings unless the adjudication of the
23                claim -

24                    (1) resulted in a decision that was contrary to, or involved
an unreasonable application of, clearly established Federal law, as
25                determined by the Supreme Court of the United States; or

26  /////

4

1          (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
2          State court proceeding.

3   See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362

4   (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision

5   does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review

6   of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See

7   also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

8   we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

9   error, we must decide the habeas petition by considering de novo the constitutional issues

10  raised.").

11          The court looks to the last reasoned state court decision as the basis for the state

12  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

13  state court decision adopts or substantially incorporates the reasoning from a previous state court

14  decision, this court may consider both decisions to ascertain the reasoning of the last decision.

15  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court

16  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

17  habeas court independently reviews the record to determine whether habeas corpus relief is

18  available under § 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v.

19  Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not reached

20  the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's

21  deferential standard does not apply and a federal habeas court must review the claim de novo.

22  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

23  II.  Petitioner's Claims

24       A.  Procedural Default

25          Respondent asserts that federal habeas review of all of petitioner's claims except

26  his prosecutorial misconduct (claim five) and sentencing error (claim seven) are procedurally

barred.  (Answer at 19.[2])  Respondent notes that petitioner raised his other five claims (claims one through four and six) in his February 9, 2007, state habeas petition filed with the Amador County Superior Court.  Respondent argues that court denied relief citing the decision in In re Dixon, 41 Cal.2d 756, 759 (1953) and stating that petitioner should have raised these claims on appeal but failed to do so.  (Id. at 21-22.)  Respondent contends that the Amador County Superior Court's ruling in this regard constitutes a procedural bar which precludes this court from addressing the merits of the specified claims.

State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes, 433 U.S. 72, 81-82 (1977).  As a general rule, a federal habeas court "'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'"  Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  The state rule for these purposes is only "adequate" if it is "firmly established and regularly followed."  Id. (quoting Ford v. Georgia, 498 U.S. 411, 424 (1991)).  See also Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003) ("[t]o be deemed adequate, the state law ground for decision must be well-established and consistently applied.")  The state rule must also be "independent" in that it is not "interwoven with the federal law."  Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)).  Even if the state rule is independent and adequate, the challenged claims may be reviewed by the federal court if the petitioner can show: (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

/////

---

[2] Page number citations such as this one are to the page number reflected on the courts CM/ECF system and not to page numbers assigned by the parties.

1          A reviewing court need not invariably resolve the question of procedural default

2   prior to ruling on the merits of a claim where the default issue turns on difficult questions of state

3   law.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Busby v. Dretke, 359 F.3d

4   708, 720 (5th Cir. 2004).  Under the circumstances presented here, this court finds that

5   petitioner's claims can be resolved more easily by addressing them on the merits.  Accordingly,

6   this court will assume that petitioner's claims are not procedurally defaulted.

7          B.  Admission of Private Diaries

8          Petitioner claims that his private diaries were illegally seized "without probable

9   cause."  (Am. Pet. at 8.)  In addition, petitioner argues that "extrajudicial statements" from those

10  diaries were admitted into evidence before all the elements of the charged crimes were

11  established and that doing so denied him "a proper recourse to cross-examine."  (Id.)

12         The United States Supreme Court has held that "where the State has provided an

13  opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be

14  granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional

15  search or seizure was introduced at his trial."  Stone v. Powell, 428 U.S. 465, 494 (1976).

16         Here, petitioner argues that he did not have an opportunity for full and fair

17  litigation of his Fourth Amendment claim because the trial judge denied defense counsel's

18  written and oral objections to introduction of the diaries into evidence without making a

19  "decision on the oral objections" or a "hear[ing] [on] the written objection[s]."  (Traverse at 8.)

20  First, there is no factual basis to support petitioner's bare allegations in this regard.  The portions

21  of the record that petitioner cites in support of this claim relate to his preliminary hearing, not his

22  trial.  At the preliminary examination, then-defense counsel objected to the admission of

23  petitioner's journals into evidence on the grounds that their admission would violate petitioner's

24  right to privacy, his constitutional right not to incriminate himself and pursuant to California

25  Evidence Code § 352.  (CT at 102-04; 170-71.)  The court overruled those objections at the

26  preliminary examination.  (CT at 171.)  Prior to trial, defense counsel sought to exclude from

7

1    evidence only portions of petitioner's journals on relevance and Evidence Code § 352 grounds.

2    (See generally RT 345-425).   The trial court ruled on those objections, making various

3    redactions to the journal entries in response to the defense objections.  (Id.)  As petitioner

4    concedes, none of his counsel ever filed a motion to suppress the journals from admission into

5    evidence pursuant to California Penal Code § 1538.5 even though they certainly were provided

6    the opportunity to do so.[3]  (Traverse at 8.)  Of course, claims of erroneous evidentiary rulings

7    under state law by the trial court cannot form an independent basis for federal habeas relief.

8         Moreover, even assuming arguendo that petitioner's suggestion that the state court

9    failed to properly rule on his objections to the admission of the journals into evidence were true,

10   his Fourth Amendment claim presented in this federal habeas petition would still be without

11   merit.  This is so because "[t]he relevant inquiry is whether petitioner had the opportunity to

12   litigate his [Fourth Amendment] claim, not whether he did in fact do so or whether the claim was

13   correctly decided."  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).  See also

14   Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990); Locks v. Sumner, 703 F.2d 403, 408 (9th

15   Cir. 1983), cert. denied, 464 U.S. 933 (1983).

16        Here, petitioner clearly had the opportunity to litigate his Fourth Amendment

17   claim both before the trial court and on appeal.  There is no evidence before this court indicating

18   that petitioner was denied a full and fair opportunity to litigate any Fourth Amendment claim he

19   wished to present in state court.  Accordingly, this claim for relief is barred in this federal habeas

20   proceeding.  Stone, 428 U.S. at 494.

21        With respect to petitioner's argument that his diaries were improperly admitted

22   into evidence at his trial, absent some federal constitutional violation, a violation of state law

23

24        [3] Petitioner has failed to present any persuasive argument that a motion to suppress
25   evidence directed at his journals would have had any possibility of success since the probable
     cause showing in the search warrant application was based in large part on petitioner's recorded
26   conversation with his son over the jail telephone in which petitioner told his son of the nature of
     the journals and directed him to retrieve them. (See RT at 177-79.)

                                                  8

1   regarding the admissibility of evidence does not provide a basis for habeas relief.  See

2   Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

3   Rhoades v. Henry, 596 F.3d 1170, 1177 n.5 (9th Cir. 2010).  A state court's evidentiary ruling,

4   even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so

5   fundamentally unfair as to violate due process.  Duncan v. Ornowski, 528 F.3d 1222, 1244 n. 10

6   (9th Cir. 2008); Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d

7   971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("the

8   issue for us, always, is whether the state proceedings satisfied due process; the presence or

9   absence of a state law violation is largely beside the point").  In this regard, the United States

10  Supreme Court has admonished that the category of infractions that violate "fundamental

11  fairness" has been defined very narrowly.  Estelle, 502 U.S. at 72.  See also Holley v.

12  Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (Noting that the "Supreme Court has made

13  very few rulings regarding the admission of evidence as a violation of due process.")  Thus, a

14  habeas petitioner "bears a heavy burden in showing a due process violation based on an

15  evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005), amended by 421

16  F.3d 1154 (9th Cir. 2005).

17          A writ of habeas corpus will be granted due to the erroneous admission of

18  evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the

19  adversary system will not be competent to uncover, recognize, and take due account of its

20  shortcomings.'"  Mancuso v. Olivarez, 292 F.3d 939, 956 (9th Cir. 2002) (quoting Barefoot v.

21  Estelle, 463 U.S. 880, 899 (1983)).  Evidence violates due process only if "there are no

22  permissible inferences the jury may draw from the evidence."  Jammal, 926 F.2d at 920.  Even

23  then, evidence must "be of such quality as necessarily prevents a fair trial."  Id. (quoting

24  Kealohapauole v. Shimoda, 800 F.2d 1463 (9th Cir. 1986)).

25          Here, petitioner has not met his heavy burden of showing a due process violation

26  based on the admission of his diary entries into evidence at his trial.  While he generally objects

1  to their introduction petitioner does not claim that the statements made in his diaries were

2  unreliable, admittedly a difficult argument as he was the author of those statements.  Moreover,

3  petitioner does not argue that there was no permissible inferences the jury could have drawn from

4  the statements in his diaries.  Even if petitioner offered such an argument it would be meritless

5  since the statements included a precise retelling of petitioner's thoughts and actions leading up

6  to, during and after the time of the alleged crimes, from which the jury could have drawn the

7  reasonable inference of petitioner's guilt.  (Reporter's Transcript On Appeal ("RT") at 686-94.)

8         Accordingly, for the reasons set forth above, petitioner is not entitled to federal

9  habeas relief with respect to this claim.

10        C.  <u>Conviction Based Solely on Diaries</u>

11        Petitioner asserts that the "only evidence . . . presented against petitioner was his

12  uncorroborated extrajudicial statements" found in his "illegally seized private diaries."  (Am. Pet.

13  at 13.)  Petitioner argues that there was no evidence introduced at his trial to support his

14  conviction other than his "extrajudicial statements" found in the diaries.  (<u>Id.</u> at 14.)

15        The Due Process Clause of the Fourteenth Amendment "protects the accused

16  against conviction except upon proof beyond a reasonable doubt of every fact necessary to

17  constitute the crime with which he is charged."  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  There

18  is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

19  favorable to the prosecution, any rational trier of fact could have found the essential elements of

20  the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  "[T]he

21  dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a

22  finding of guilt beyond a reasonable doubt.'"  <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir.

23  2004) (quoting <u>Jackson</u>, 443 U.S. at 318).  "A petitioner for a federal writ of habeas corpus faces

24  a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction

25  on federal due process grounds."  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  In

26  order to grant the writ, the federal habeas court must find that the decision of the state court

1    reflected an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case.

2    <u>Id</u>. at 1275 & n. 13.

3            Portions of petitioner's diaries were read to the jury, including the following

4    incriminating entries by petitioner[4]:

> We got back to camp yesterday about 4:00.  I got my hand saw and
> Ginger and I went up to the hillside where I cut some 12 or 14 inch
> lengths of manzanita specifically for selecting one to use as a club
> to beat this mother-fucker on the head with, should I decide to go
> through with my crime.
>
>                              * * *
>
> I thought today of how, because I've never hit anyone in the head
> before, I don't really know what to expect.  I hope to knock him
> unconscious so I can bound him with rope.  If I kill him, don't
> want to do it right away because I don't want to haul around a dead
> body until I find a place to dump it.
>
>                              * * *
>
> I will get revenge on this pig fucker yet for he betrayed my
> friendship, and maybe soon I think about how I might wait until
> after dark when he's all folded up in his cramped corner, beat him
> with this hard stick of manzanita, pack the truck, and leave.
>
>                              * * *
>
> I did it.  I smashed his skull with a manzanita club, and took the
> truck, and I'm at Kruger's.  He'll meet me here this evening.  It's
> 2:10 now.  It was brutal, and the meanest, coldest thing I've ever
> done.  I'm even in a little shock.  Ginger, I don't think, is sure what
> happened.  He came in about 11:30 last night lit as high as a kite.
> He folded up in his corner, and I thought that was my time, but I
> chickened out.  When he woke me up at 3:00 o'clock this morning
> to take a beer and booze piss, I was really mad.  After he climbed
> in bed, I stewed.  Then I got up, had a cigarette, and thought I'll
> nail him in his sleep.  It was only light enough in here to see that he
> was lying close to the outside edge facing me which gave me
> plenty of room to swing the club as hard as I could.  I stewed for
> several more minutes, and then just did it.  I cracked him several
> times, and he snorted real loud, like a snore.  I swung a few more
> times, and still he snorted continuously, so I just put my stuff in the

/////

---

[4]  In arguing in support of this claim petitioner repeats his contention that his diaries were improperly admitted into evidence at trial.  The undersigned has rejected that argument above.

truck that was in the shed behind us, and unhooked the power and drain hose, and drove off.

He moaned and grunted continuously.  A few miles down the road he fell off the bunk with his bloody head down in the well by the door with his legs up in the air resting against the seat where I sit.  I had the curtain up, and could only hear him.  Everything on the table scattered, and there was blood splashed, but not everywhere.  I think it was about 4:00 when I hit him, and only a few minutes later when I left.  I pulled over as soon as I could after he fell, laid out my foam pad, and laid him on it, then I drove off.  There was a pool of blood in the well.  He kept moaning and struggling to get up, but didn't have the strength or coordination.

It began to get light out about the time I made San Andreas.  I'll drop him off somewhere so somebody might see him and call for help, I thought.  I waited until this side of Dry Town, I think, and pulled him out of the truck onto the shoulder and drove off.  He'd shit all over, I think, before Jackson.  A few minutes before Placerville I threw the foam pad out with the shit and blood.  He seemed to want to fight and struggle, so I pulled him out, and was still moaning when I drove off.

I don't know if he'll live, but if he does, I can't imagine he'll ever be the same.  I guess I'm still really fucking mad that I don't feel as bad as I expect a person should feel after such a brutal attack, and probably most of my anger still burning is jealousy that he was doing so well while I was doing so poorly.  But still, I justify it because of how betrayed I felt and have felt over tens and tens of incidents over many years.

In Placerville I stopped at a supermarket parking lot to clean up the blood and shit.  When I came back in the truck, a load of stuff after hitting him, there was an unfamiliar and sickening odor which must have come from his skull.  It seems to still be in the truck even after cleaning up as best I could.  His pillow and sheets are still up there, though, and they have a lot of blood.  I don't know yet how or where I will discard them so as not to draw suspicion, but I can't leave them in there long.

\* \* \*

I stopped in Sutter Hill for gas.  He was still in the truck.  I got out his wallet, and only found $19 until, when in Placerville, I checked hidden pockets and found only one $100 bill.  The son-of-a-bitch has blown, drank up, and pissed away hundreds and hundreds of dollars in the last month.  And when I checked for pot, he smoked all whatever he had, so I'm not set very well, maybe $120.  I forgot to say that all he was wearing was a T-shirt.

\* \* \*

12

Boy it's hard not to think about this.  It's about all I've thought about since.  After I parked at Kruger's, I went looking for a pay phone to call him.

I dug deeper into his wallet and found two more C notes, so I have $300.  And I counted his food stamps, and there are $194.

* * *

I probably shouldn't have been so brutal.  I suppose I'd rather see him live.  I don't know what I would have felt had I killed him. This is bad enough.

* * *

I started yesterday afternoon working on a phony journal that says I hitchhiked over here when I got disgusted with old pig fuck.  If I get called on anything, maybe this will prove an alibi, who knows?

* * *

I still think of old pig fuck often, but every time I do it's with clenched teeth and anger.  I feel no remorse or guilt for what I did. Fuck that asshole.

(RT at 672-98.)

In addition to these journal entries the jury heard testimony from Kenneth Kruger, who testified that petitioner visited him at his studio in Reno, Nevada immediately after the alleged crimes were committed.  (Id. at 515.)  According to Kruger, petitioner was driving the victim's motor home.  (Id. at 519.)  Kruger testified that petitioner told him that he had attacked the victim and that there was blood inside the motor home.  (Id. at 516-19.)  A neighbor also testified to seeing petitioner and the motor home at Kruger's during this time period.  (Id. at 539-44.)

The jury also heard testimony from Sergeant Lawrence of the Amador County Sheriff's Office that the victim was found early in the morning on a dirt turnout on Highway 49 between Sutter Creek and Amador City.  (Id. at 546-47.)  When found, the victim was wearing only a T-shirt and was covered in blood and feces.  (Id. at 548.)  A piece of foam rubber was also found at the scene.  (Id. at 551.)  Sergeant Lawrence testified that several years after the attack,

13

1    after the investigation "went cold" and was suspended, police discovered the victim's motor

2    home at a wrecking yard in Reno, Nevada.  (Id. at 555-57.)  The jury heard that found inside the

3    motor home were a pillow with a very large blood stain, a 14-inch piece of manzanita wood, and

4    a foam rubber pad similar to that found at the scene where the victim was discovered.  (Id. at

5    566, 656.)  The motor home was traced back to Kruger's studio in Reno where petitioner had

6    stayed for a brief time after the attack.  (Id. at 557-59.)  Although petitioner's entries in his own

7    diaries were powerful evidence against him, the additional evidence linking petitioner to the

8    motor home and the incriminating evidence eventually found by law enforcement inside that

9    motor home provided compelling evidence of petitioner's guilt as well.

10               Viewing this evidence in the light most favorable to the verdict, the undersigned

11   concludes that there was sufficient evidence introduced at petitioner's trial from which a rational

12   trier of fact could have found beyond a reasonable doubt that petitioner was guilty of the crimes

13   he was convicted of.  Accordingly, petitioner is not entitled to federal habeas relief with respect

14   to his claim that the evidence introduced at his trial was insufficient to support his conviction.

15          D.  Vicinage Rights

16               Petitioner next claims that all the alleged crimes were committed outside of

17   Amador County where he was tried.  (Am. Pet. at 9.)  Petitioner asserts, therefore, that Amador

18   County did not have jurisdiction to prosecute him.  (Traverse at 23.)

19               The last reasoned state court decision on this claim is from the California Court of

20   Appeal.  That court specifically rejected petitioner's lack of jurisdiction argument, reasoning as

21   follows:

22               Prior to submission of the case to the jury, defendant moved to
                 dismiss the counts alleging attempted murder, assault by means of

23               force likely to produce great bodily injury, and aggravated mayhem
                 because they were completed in Tuolumne County, thereby

24               depriving Amador County of territorial jurisdiction of these
                 offenses.  The trial court denied the motion.

25
                 On appeal, defendant renews his venue argument with respect to

26               the assault by means of force likely to produce great bodily injury

and aggravated mayhem convictions, and adds that the court's ruling resulted in a denial of his due process rights.  Noting that the general venue statute states, "the jurisdiction of every public offense is in any competent court within the jurisdictional territory of which it is committed" (§ 777), defendant posits, "These crimes were completed in Tuolumne County, and there is no statutory exception which grants Amador County venue or territorial jurisdiction."

Contrary to defendant's assertion, there is ample authority to uphold venue on the two challenged counts.  Section 781 provides: "When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory."

"'Section 781 constitutes an exception to the rule when acts or effects of an offense occur in multiple counties.  Section 781 is remedial and, thus, we construe the statute liberally to achieve its purpose of expanding criminal jurisdiction beyond rigid common law limits.  [Citations.]  We therefore interpret section 781 in a commonsense manner with proper regard for the facts and circumstances of the case rather than technical niceties.  [Citation.]  [¶]  Courts have construed the phrase "requisite to the consummation of the offense" to mean requisite to achieving the offender's unlawful purpose.  [Citation.]'"  People v. Gutierrez (2002) 28 Cal.4th 1083, 1118 (Gutierrez).)  "On review, a trial court's determination of territorial jurisdiction will be upheld as long as there is 'some evidence' to support its holding.  [Citations.]"  (Id. at p. 1117.)

In light of this rule of liberal construction, it is not surprising that by 1940 the court of appeal had rejected the argument defendant makes herein, namely, that the act committed in the territorial jurisdiction in which the criminal action is prosecuted must be one which involves a necessary element of the crime.  As noted in the later case of People v. Williams (1973) 36 Cal.App.3d 262 (Williams), the court of appeal "said that such an interpretation 'would completely disregard the phrase "or the acts or effects thereof constituting or requisite to the consummation of the offense" ' " contained in the section.  Obviously, the phrase, "'or requisite to the consummation of the offense" means requisite to the completion of the offense-to the achievement of the unlawful purpose-to the ends of the unlawful enterprise.  By the use of the word "consummation" the Legislature drew a distinction between an act or an effect thereof which is essential to the commission of an offense, and an act or effect thereof which, although unessential to the commission of the offense, is requisite to the completion of the offense - that is, to the achievement of the unlawful purpose of

15

the person committing the offense.'" (<u>Williams</u>, <u>supra</u>, 36 Cal.App.3d at p. 268.)

In <u>Williams</u>, the court upheld venue in Ventura County on an embezzlement charge against a gasoline truck driver who misappropriated 2,000 gallons of fuel in Los Angeles County.  The driver thereafter delivered the rest of the fuel to a legitimate customer in Ventura County, where he falsified the delivery ticket to show he had delivered the entire load in Ventura.  The falsification of the ticket was not essential to the crime, but the court upheld jurisdiction, writing: "Under the circumstances of this case the trip to Ventura County and falsification of the delivery records there were so closely connected in time to the misappropriation of the gasoline, and so obviously required if appellant was to successfully complete his run, that Ventura County had jurisdiction under the above interpretation . . . ." (<u>Williams</u>, <u>supra</u>, 36 Cal.App.3d at p. 269.)

Applied to the present case, <u>Williams</u> supports the conclusion that venue was proper in Amador County for the charges of assault with intent to commit great bodily injury and aggravated mayhem.  To begin with, venue for the greater attempted murder charge was proper in Amador County because defendant's decision to dump the victim's prostrate body there was the final step in the murder attempt, and effectively brought his crimes of violence against the victim to a close.[FN1]  The act also served to increase the chances that defendant would evade detection not only for the attempted murder, but for the section 205 and 245, subdivision (a)(1) offenses.  In applying section 654 to these two offenses, the court expressly found that the crimes were part of an indivisible course of conduct that included the attempted murder.  The crimes also were of the same class and were properly tried together.  (§ 954; <u>People v. Britt</u> (2004) 32 Cal.4th 944, 954.)  Furthermore, the section 205 and 245, subdivision (a)(1) offenses were committed to facilitate the kidnapping and vehicle theft, which were crimes properly tried in Amador County.[FN2]  In these circumstances, logic and common sense dictate that all of the charges should have been tried in a single county, as they were, rather than split into duplicative trials in different counties, thereby taxing the public fisc and forcing defendant to station his defenses on two fronts rather than one.

> FN1. Section 790, subdivision (a) extends venue in murder cases to the county where the victim's body is found.  While defendant here was charged with attempted murder only, section 790's alternative venue provision reflects a policy determination by the Legislature that the discovery of the victim's body is a sufficient basis to invoke the territorial jurisdiction of the county in which the discovery is made.  This policy would support venue in Amador

County.  Its significance is not diminished merely because the victim herein was fortunate enough to have survived defendant's murder attempt.

FN2. Kidnapping is a continuous offense and venue extends to every county through which the victim is transported.  (§ 784; People v. Simon (2001) 25 Cal.4th 1082, 1094, fn. 6 [the "offense of kidnapping, false imprisonment, or seizure for slavery may be tried in the county in which the offense was committed, or the county out of which the person was taken, or a county 'in which an act was done by defendant in instigating, procuring, promoting, or aiding in the commission of the offense' "].)  Similarly, venue for the theft offense is proper in a county into which the property is taken.  (§ 786, subd. (a); People v. Simon, supra, 25 Cal.4th at p. 1094 ["section 786 has provided, since the original enactment of the Penal Code in 1872, that when property taken by burglary, robbery, theft, or embezzlement in one county has been brought into another county, the trial of the initial burglary, robbery, theft, or embezzlement offense may be held in either county"].)

Defendant's reliance on Gutierrez, supra, 28 Cal.4th 1083 is unavailing.  In Gutierrez, the defendant murdered a woman in Kern County, stuffed her body in the back of her van, and drove to his ex-wife's residence in San Bernardino County, where he shot and killed her lover and kidnapped his ex-wife.  (Id. at pp. 1107-1109.)  Thereafter, while driving in Riverside County, defendant attempted to kill a patrol officer who pulled him over because one of the van's headlamps was out.  (Id. at pp. 1109-1110.)  Defendant was arrested, and the van impounded and towed to a storage facility in San Bernardino County, where the murdered woman's body was discovered in the van.  (Id. at p. 1110.)  Defendant was tried on all charges in San Bernardino County, including the attempted murder of the officer in Riverside County.  (Id. at pp. 1106-1107.)

The Supreme Court held that venue was proper in San Bernardino County for the attempted murder of the patrol officer, even though that criminal act took place entirely in Riverside County.  The court reasoned that the kidnapping of the ex-wife was a continuing offense, and that the attempted murder was undertaken to avoid detection.  (Gutierrez, supra, 28 Cal.4th at pp. 1117-1118.)  As applied to the instant action, Gutierrez stands for the proposition that venue properly would lie in the county where the kidnapping occurred - Tuolumne County - for crimes committed thereafter in Amador County that prolonged the kidnapping.  Gutierrez, though, did not have occasion to consider the converse - whether venue would have been proper in Riverside County for the crimes committed in Kern or San Bernardino counties - which would be analogous to the fact pattern in the present case.  Since cases are not authorities for propositions not

17

1    considered (People v. Superior Court (Zamudio) (2000) 23 Cal.4th 183,
2    198), Gutierrez does not assist defendant.

3    (Opinion at 3-8.)

4          "The vicinage clause of the Sixth Amendment guarantees an accused 'the right to a

5    . . . jury of the . . . district wherein the crime shall have been committed, which district shall have

6    been previously ascertained by law.'"  Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004)

7    (quoting U.S. CONST. AMEND. VI.), cert. denied 543 U.S. 1191 (2005).  As part of the Bill of

8    Rights, at the time of its adoption the Sixth Amendment applied only to the federal government

9    and thus only to federal prosecutions.  (Id.)  Later, certain rights guaranteed by the Bill of Rights

10   were extended to protect against state action by the Fourteenth Amendment Due Process Clause.

11   (Id.)  However, [n]ot all of the rights guaranteed by the Sixth Amendment were incorporated;

12   rather, only those rights that are 'fundamental to the American scheme of justice' or 'essential to

13   a fair trial' apply to the states."  (Id.) (quoting Duncan v. Louisiana, 391 U.S. 145, 148-49 (1968).

14          Neither the U.S. Supreme Court or the Ninth Circuit Court of Appeals have decided

15   whether the Fourteenth Amendment incorporated the Sixth Amendment's vicinage right.

16   Stevenson, 384 F.3d at 1071.  The California Court of Appeal's conclusion that there was a

17   sufficient connection between the crimes with which petitioner was charged and Amador County

18   so as to permit a trial by an Amador County jury is, therefore, not contrary to, or an unreasonable

19   application of, clearly-established federal law.  Stevenson, 384 F.3d at 1072; see also Olagues v.

20   Brown, No. C 07-3918 JSW (PR), 2010 WL 3749422, at *5-6 (N.D. Cal. Sept. 23, 2010)

21   (rejecting petitioner's federal habeas claim that the Vicinage Clause of the Sixth Amendment was

22   violated in his state court prosecution).  Accordingly, petitioner is not entitled to federal habeas

23   relief with respect to this claim.

24          E.    Ineffective Assistance of Counsel

25          Petitioner claims that his trial counsel rendered ineffective assistance of counsel by:

26   (1) failing to conduct reasonable pre-trial investigation and trial preparation; (2) failing to "put

18

1  the prosecution's case to a true adversarial test"; and (3) failing to present evidence of mitigating

2  circumstances at his sentencing.  (Am. Pet. at 9-11.)

3       The last reasoned state court decision in response to this claim is that of the Amador

4  County Superior Court.  That court denied habeas relief as to this claim, finding that petitioner

5  had "failed to demonstrate prejudice, as a result of any alleged ineffective assistance of counsel."

6  (Lod. Doc. 10 at 3.)  After setting forth the applicable legal principles, the court will address each

7  aspect of petitioner's ineffective assistance of counsel claim in turn below.

8       1. <u>Legal Standards</u>

9       The Sixth Amendment guarantees the effective assistance of counsel.  The United

10  States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

11  <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To support such a claim, a petitioner must first

12  show that, considering all the circumstances, counsel's performance fell below an objective

13  standard of reasonableness.  466 U.S. at 687-88.  After a petitioner identifies the acts or

14  omissions that are alleged not to have been the result of reasonable professional judgment, the

15  court must determine whether, in light of all the circumstances, the identified acts or omissions

16  were outside the wide range of professionally competent assistance.  <u>Id.</u> at 690; <u>Wiggins v.</u>

17  <u>Smith</u>, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that he was prejudiced by

18  counsel's deficient performance.  <u>Strickland</u>, 466 U.S. at 693-94.  Prejudice is found where

19  "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

20  proceeding would have been different."  <u>Id.</u> at 694.  A reasonable probability is "a probability

21  sufficient to undermine confidence in the outcome."  <u>Id.</u>  <u>See also</u> <u>Williams</u>, 529 U.S. at 391-92;

22  <u>Laboa v. Calderon</u>, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine

23  whether counsel's performance was deficient before examining the prejudice suffered by the

24  defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an

25  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

26  /////

1  followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

2  697).

3          In assessing an ineffective assistance of counsel claim "[t]here is a strong

4  presumption that counsel's performance falls within the 'wide range of professional assistance.'"

5  Kimmelman, 477 U.S. at 381 (quoting Strickland, 466 U.S. at 689).  There is, in addition, a

6  strong presumption that counsel "exercised acceptable professional judgment in all significant

7  decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S.

8  at 689).

9          2.  Failing to Conduct Reasonable Pre-Trial Investigation and Trial Preparation

10         Petitioner claims that his trial counsel rendered ineffective assistance by failing

11  properly investigate and prepare for trial.  (Am. Pet. at 10.)  Specifically, petitioner argues that

12  his trial counsel failed to review medical reports, photographs and petitioner's journals, and did

13  not interview the victim until the day before trial commenced.  (Id.)  Petitioner asserts that his

14  trial counsel acknowledged several times on the first day of the trial that he "was not prepared

15  and was concerned his client might suffer the consequences."  (Id.)

16         Defense counsel has a "duty to make reasonable investigations or to make a

17  reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at

18  691.  "This includes a duty to . . . investigate and introduce into evidence records that

19  demonstrate factual innocence, or that raise sufficient doubt on that question to undermine

20  confidence in the verdict." Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing Hart v.

21  Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999)).  In this regard, it has been recognized that "the

22  adversarial process will not function normally unless the defense team has done a proper

23  investigation." Siripongs v. Calderon (Siripongs II), 133 F.3d 732, 734 (9th Cir. 1998) (citing

24  Kimmelman v. Morrison, 477 U.S. 365, 384 (1986)).  Therefore, counsel must, "at a minimum,

25  conduct a reasonable investigation enabling him to make informed decisions about how best to

26  represent his client." Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting

20

1    Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and quotations omitted).

2    On the other hand, where an attorney has consciously decided not to conduct further investigation

3    because of reasonable tactical evaluations, his or her performance is not constitutionally

4    deficient.  See Siripongs II, 133 F.3d at 734; Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.

5    1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not to investigate thus

6    'must be directly assessed for reasonableness in all the circumstances.'"  Wiggins, 539 U.S. at

7    533 (quoting Strickland, 466 U.S. at 691).  See also Kimmelman, 477 U.S. at 385 (counsel

8    "neither investigated, nor made a reasonable decision not to investigate"); Babbitt, 151 F.3d at

9    1173-74.  A reviewing court must "examine the reasonableness of counsel's conduct 'as of the

10   time of counsel's conduct.'"  United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990)

11   (quoting Strickland, 466 U.S. at 690).  Furthermore, "'ineffective assistance claims based on a

12   duty to investigate must be considered in light of the strength of the government's case.'"  Bragg,

13   242 F.3d at 1088 (quoting Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986)).

14            With respect to petitioner's allegations concerning his trial counsel's failure to review

15   the medical reports, photographs, and petitioner's own journals, and the alleged failure to

16   interview the victim at an earlier time, petitioner has not alleged what a review of these

17   documents or an earlier interview of the victim would have uncovered or how it would have

18   favorably impacted the result in his case.  Petitioner does not state how his decision to proceed to

19   trial or his defense was harmed by his trial counsel's alleged deficiencies.  As such petitioner has

20   failed to allege, let alone establish, prejudice.  See Bragg v. Galaza, 242 F.3d 1082, 1088 (9th

21   Cir. 2001) (no ineffective assistance where petitioner did "nothing more than speculate that, if

22   interviewed," a witness might have given helpful information); Jones v. Gomez, 66 F.3d 199,

23   204 (9th Cir. 1995) ("conclusory allegations which are not supported by a statement of specific

24   facts do not warrant habeas relief"); United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987)

25   (appellant failed to satisfy the prejudice prong of an ineffective assistance claim because he

26   offered no indication of what potential witnesses would have testified to or how their testimony

might have changed the outcome of the hearing); Eggleston v. United States, 798 F.2d 374, 376

(9th Cir. 1986) (no ineffective assistance where defendant fails to state what additional

information would be gained by discovery he claims was necessary and record shows trial

counsel was well-informed).

Moreover, as noted above, "'ineffective assistance claims based on a duty to

investigate must be considered in light of the strength of the government's case.'"  Rhoades v.

Henry, 611 F.3d 1133, 1142 (9th Cir. 2010) (quoting Rios v. Rocha, 299 F.3d 796, 808-09 (9th

Cir. 2002).  Here, the prosecution's case against petitioner was exceptionally strong, as

demonstrated by the evidence reviewed above.  Indeed, in denying defense counsel's motion for

a new trial the trial judge noted that he had "never seen evidence stronger in any criminal case in

[his] life."  (RT at 992.)

With respect to petitioner's claim that his trial counsel was not adequately prepared

for trial, petitioner has cited instances in which his trial counsel allegedly expressed concern

about his readiness and ability to prepare for petitioner's trial in light of extenuating

circumstances and a heavy case load.  For example, petitioner's trial counsel stated at a hearing

one week before petitioner's trial commenced that:

> For the record, what I told the Court is unfortunately over the weekend my
> investigator gave me her resignation.  She didn't give me any notice.  That
> has affected me.  In addition to that, she had been sick last week and that's
> affected my ability to complete some investigation that was warranted and
> needs to be finished.  In addition to that the additional problems that I've
> had is for essentially the most of the month of December and the first
> week in January one of my attorneys was out.  I was having to assist to
> cover some of his cases.  I had to go out to Mule Creek twice, cover video
> calendar.  I apologize.  The nature of this business sometimes gets very
> hurried, last minute.  I'm sure [petitioner] doesn't like it, but it is the
> situation that I'm operating under.  What I've done, I've made
> arrangements for a licensed private investigator to complete the
> investigation.  That gentleman accompanied me to the interview of
> [petitioner] to kind of get a picture of what I want him to do.  We did that
> today.  The investigation will hopefully be complete by Friday is what
> we're hoping.

* * *

/////

1

2        I have done my - - I have done my utmost best to be prepared.  This case
         has certain complexities in terms of voluminous amounts of reports as the
         Court aware (sic), client journals.  There are factual issues that I've
3        attempted to grasp.  There are also legal issues regarding the admissibility
         of certain (sic) of the evidence, the elements of the offenses, but done (sic)
4        everything that I can in order to be prepared at this point.  My client is not
         waiving time.  I am doing everything I can to be sure that I'm ready.  I am
5        doing that, that's my obligation to my client, obligation (sic) that I take
         very seriously.  So at this point in time I believe I will be ready by
         Tuesday.  That I will represent my client in a zealous manner.

6

7    (RT at 313-15.)  In rejecting a plea bargain offer that was on the table at that time and responding

8    to his lawyer's statement, petitioner told the trial judge that "I have all the confidence I need in

9    [trial counsel] to represent me in due time."  (Id. at 316.)

10           Petitioner also points to another aspect of the record in support of this claim.  Just

11   prior to the commencement of trial, defense counsel announced the possibility of calling

12   additional witnesses to testify as to petitioner's good character.  (Id. at 411-25.)  In response, the

13   deputy district attorney came forward with approximately twenty pages of petitioner's

14   voluminous personal journal which the prosecutor indicated he would seek to enter into evidence

15   to rebut any such character testimony.  (Id.)  Defense counsel objected, arguing that petitioner

16   himself had requested and been denied copies of all sixty volumes of his journals that were in the

17   custody of law enforcement and yet these particular pages were unfairly being brought forward

18   by the prosecution on the eve of trial.  (Id.)  The deputy district attorney countered that

19   petitioner's previous attorneys had not made a discovery request for the production of copies of

20   all sixty journal volumes, that current counsel had been free to review all of the journals and that

21   the prosecution had no intention of offering the twenty pages in question into evidence until the

22   defense announced the possibility of calling character witnesses at the last minute.[5]  (Id.)  The

23   _____

24       [5]  As indicated during this exchange, and as will be discussed further below, petitioner
     had been represented by two other attorneys before trial counsel substituted into the case.  (RT at
25   416; see also RT 354-55.)  Petitioner had filed a Marsden motion against both which resulted in
     his first two appointed counsel being replaced.  (RT at 354.)  Following trial counsel's entry into
26   the case, the defense at some point elected to pursue the strategy of withdrawing the previously
     entered time-waiver thereby requiring that petitioner's trial be "short set."  (RT at 417.)

trial judge then denied defense counsel's request for production of copies of all sixty journal

volumes and for a jury instruction informing jurors that the prosecution had belatedly provided

discovery they were required to produce. (Id. at 423-25.)  In this context, and in response to the

trial court's ruling, defense counsel stated:

> Like I said, I'm handling 450 felony cases.  According to the American
> Bar Association, I'm only supposed to handle 150.  I do my best.  This is a
> big case.
>
> * * *
>
> You know, but could I have spent more time?  Absolutely.  And it's
> unfortunate that [petitioner] is going to be punished for that.

(Id. at 424-25.)

While petitioner has cited these statements by his trial counsel as evidence that

counsel was not prepared, in order to establish prejudice petitioner must show that his trial

counsel's errors were so serious as to deprive him of a fair trial with a reliable result.  Strickland,

466 U.S. at 687.  Here, petitioner has not alleged any actual errors or deficient performance by

his counsel during the trial.  Rather, he has merely offered conclusory allegations that his trial

counsel was not prepared.  "Conclusory allegations which are not supported by a statement of

specific facts do not warrant habeas relief."  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).

Accordingly, for the above reasons, petitioner is not entitled to federal habeas relief

on this aspect of his ineffective assistance of counsel claim.

### 3.  Failing to "Put the Prosecution's Case to a True Adversarial Test"

Petitioner next asserts that his trial counsel "failed to put the prosecution's case to a

true adversarial test" because counsel's cross-examination "amounted to no more than getting

these witnesses to reiterate" their direct examination testimony.  (Am. Pet. at 10.)  Petitioner also

alleges that his trial counsel failed to call rebuttal witnesses who, according to petitioner, "could

have shown the victim's injuries were not life threatening."  (Id.)  Petitioner also accuses his trial

counsel of failing to investigate the search warrant authorizing the search for and seizure of his

1  journals, which petitioner claims would "have proven [the warrant] deficient in probable cause

2  on which to issue," and of failing to move to suppress the journals.  (Id.)  Petitioner also asserts

3  that his trial counsel never called a psychologist who examined petitioner or the person who

4  found the victim to testify at trial.  (Id. at 11.)  According to petitioner, the psychologist  witness

5  would have testified that petitioner "did not premeditate the charge of first degree attempted

6  murder" and the other witness would have testified that the victim "was not hidden from sight as

7  testified by the prosecution."  (Id.)  In short, petitioner argues that his trial counsel "failed to plan,

8  prepare, and present any defense at all."  (Id.)

9          Petitioner's broad brush assertion that his trial counsel failed to "present any defense

10  at all" is unpersuasive.  Certainly petitioner does not specify what defense he contends his trial

11  counsel should have proffered in the face of petitioner's own damning admissions which

12  appeared in his journal.  Moreover, in a motion that petitioner himself attempted to file with the

13  trial court, and which was read into the record by the court at petitioner's sentencing hearing,

14  petitioner acknowledged that he had pleaded with his trial counsel to rest prior to putting on a

15  defense, stating:

16          On January 19th even before the defense would have presented its case in
         my trial[,] my attorney . . . informed me that my daughter . . . had been
17          subpoenaed . . . and was in town prepared to testify against me.

18          Since she knew nothing of the offenses I was being tried on the only
         purpose for her as a prosecution witness would have been to defame my
19          character on unfounded accusations of sexual misconduct.

20          It was established during that trial before [my daughter] being interviewed
         by the prosecution that such testimony would not be allowed into the trial.
21

22          Learning of my daughter's readiness and proximity to testify against me,
         forced me to radically alter the course of my trial.

23          I implored upon my attorney to rest my case before even presenting it in
         order to prevent certain travesty of my daughter taking the witness stand
24          on behalf of the prosecution.

25  (RT at 973-74.)   Accordingly, petitioner's after-the-fact complaint regarding his counsel's

26  failure to present an effective defense rings particularly hollow in this case.

25

1          With respect to the search warrant authorizing the search and seizure of petitioner's

2    journals, while detained pending trial petitioner was recorded telling his son:

3          You're going to have to go and dig out my journals, I think.

4          You're also going to find out some pretty heavy things.  We can't talk
           about it.  These phones are monitored.

5

6          One of my journals is doubled up on.  Do you understand?

7          I made one up.  One of them I made up.

8          You can go ahead and read it.  I'm afraid it will pretty well blow your
           mind.

9          I'm playing this right to the fucking edge.

10         Call Kruger and find out where he is on this business.  I hate to admit this,
           but he knows.  He knows the truth.  He knows that you don't know, but it

11         was like I had to tell somebody.

12   (RT at 177-79.)  Armed with this information obtained from petitioner himself, police officers

13   prepared an affidavit, obtained a search warrant, and subsequently seized petitioner's journals.

14   (Id. at 180.)

15         In his pending petition petitioner has not alleged in what way he believes the search

16   warrant authorizing the seizure of his journals was "deficient in probable cause" or on what

17   ground's his counsel could have moved to suppress the admission of the journals into evidence.

18   Indeed, petitioner apparently concedes as much in his traverse, stating that he "didn't suppose"

19   that his trial counsel could "prevent" the admission of his journals into evidence, but argues only

20   that counsel should have "move[d] the court for a hearing on their admissibility."  (Traverse at

21   37.)  Moreover, petitioner's trial counsel did in fact file a motion seeking to exclude portions of

22   petitioner's journals from admission into evidence and arguing against the admission of "a large

23   chunk of the entries of the journals" into evidence as "not relevant."  (RT at 351, 735-40; Clerk's

24   Transcript on Appeal ("CT") at 465-472.)[6]

25   _____

26       [6]  Prior to preliminary examination petitioner's first counsel also filed an "Objection to
Introduction to the Contents of Diary."  (CT 102–04.)  The objection was overruled.  (CT at 112.)

1         Ultimately portions of petitioner's journals relating to the attack on the victim were

2  introduced into evidence and read to the jury.  As a result, the jury learned that petitioner had

3  written in his journal of wanting to "get revenge on this pig fucker yet." (RT at 681.)  They heard

4  how petitioner fantasized about waiting until after dark to beat the victim with a manzanita stick,

5  pack the victim's truck and steal it.  (Id.) The jury also heard petitioner's explicit written

6  admission that he "did it," that he "smashed [the victim's] skull with a manzanita club, and took

7  the truck," and was "at Kruger's."  (Id. at 686)  The jury learned that petitioner had recounted in

8  his diary how he "cracked" the victim multiple times with the stick, drove off in the victim's

9  vehicle and stole money out of the victim's pockets.  (Id.)  Perhaps most devastating to the

10  defense, the jury learned that in his journal petitioner acknowledged thinking "of old pig fuck

11  often" but felt no remorse for what he had done, proclaiming of the victim, "fuck that asshole."

12  (Id. at 697-98.)

13         Thus, even assuming arguendo that trial counsel's performance was somehow

14  deficient, petitioner's claim of ineffective assistance of counsel would still fail because petitioner

15  cannot establish prejudice.  Prejudice is found where "there is a reasonable probability that, but

16  for counsel's unprofessional errors, the result of the proceeding would have been different."

17  Strickland, at 694.  Here, even if petitioner's trial counsel had more vigorously cross-examined

18  every prosecution witness, called a rebuttal witness to testify that the victim's injuries were not

19  life threatening, presented a psychologist to testify that petitioner "did not premeditate the charge

20  of first degree attempted murder" and called a witness to testify that the victim "was not hidden

21  from sight" as reported by police, there would still not be a reasonable probability that the result

22  of petitioner's trial would have been different.  In this regard, petitioner's own admissions

23  recorded in his journals would have disputed such testimony and acknowledged his guilt of the

24  crimes for which he was convicted.  Presented with the overwhelming evidence of petitioner's

25  guilt, the jury would have reached the same verdict even if trial counsel had performed as

26  petitioner now argues he should have.

1    Accordingly, petitioner is not entitled to federal habeas relief on this aspect of his

2    ineffective assistance of counsel claim.

3         4. Mitigating Circumstances

4    Petitioner claims that his trial counsel was ineffective in failing to present "mitigating

5    evidence" at his sentencing hearing.  (Am. Pet. at 11.)  Specifically, petitioner notes that he

6    "knew the victim for many years [and] many times over proved his friendship."  (Id.)  Petitioner

7    also claims that his trial counsel could have shown that petitioner had "never in the 50 years

8    before this incident been in any trouble of any kind" and had not had any incidents between

9    committing his crimes and his arrest.  (Id.)

10    Petitioner's argument that the fact that he knew the victim for many years and "many

11    times over proved his friendship," should somehow mitigate his sentence for the deliberate and

12    premeditated attempted murder of his friend by repeatedly striking him in the head with a

13    wooden stick, is illogical and wholly without merit.  Indeed, if petitioner's trial counsel had made

14    such an argument it most likely would only have served to highlight the disturbing nature of

15    petitioner's crimes.

16    Moreover, the United States Supreme Court "has not delineated a standard which

17    should apply to ineffective assistance of counsel claims in noncapital sentencing cases," therefore

18    there is no clearly established federal law in this context pursuant to which petitioner would be

19    entitled to federal habeas relief.  Davis v. Grigas, 443 F.3d 1155, 1158 (9th Cir. 2006); Cooper-

20    Smith v. Palmateer, 397 F.3d 1236, 1244 (9th Cir. 2005).

21    Accordingly, petitioner is not entitled to federal habeas relief on this aspect of his

22    ineffective assistance of counsel claim.

23    F. Prosecutorial Misconduct

24    Petitioner asserts that the deputy district attorney who prosecuted him committed

25    misconduct by failing to disclose requested discovery and by making an impermissible rebuttal

26    argument to the jury at trial.  Specifically, petitioner argues that the prosecutor failed to "turn

28

1   over to defense . . . all of petitioner's diaries." (Am. Pet. at 11-12.) Petitioner argues that the

2   prosecutor "exhibited intemperate behavior" during his rebuttal argument by using a wooden

3   stick to "violently beat on a book . . . many times" while "exclaiming in great anger, 'He didn't

4   just hit him once, he hit him again and again and again" to demonstrate to the jury how petitioner

5   beat the victim. (Id. at 12.)

6       A defendant's due process rights are violated when a prosecutor's misconduct renders

7   a trial fundamentally unfair. Darden v. Wainwright, 477 U.S. 168, 181 (1986). However, such

8   misconduct does not, per se, violate a petitioner's constitutional rights. Jeffries v. Blodgett, 5

9   F.3d 1180, 1191 (9th Cir. 1993) (citing Darden, 477 U.S. at 181 and Campbell v. Kincheloe, 829

10  F.2d 1453, 1457 (9th Cir. 1987)). Rather, claims of prosecutorial misconduct are reviewed "on

11  the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so

12  infected the trial with unfairness as to make the resulting conviction a denial of due process."

13  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995). See also Greer v. Miller, 483 U.S. 756, 765

14  (1987); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Turner v. Calderon, 281 F.3d 851,

15  868 (9th Cir. 2002). Habeas relief is limited to cases in which the petitioner can establish that

16  prosecutorial misconduct resulted in actual prejudice to the defense. Johnson, 63 F.3d at 930

17  (citing Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993)); see also Darden, 477 U.S. at 181-

18  83; Turner, 281 F.3d at 868. Put another way, prosecutorial misconduct violates due process

19  when it has a substantial and injurious effect or influence in determining the jury's verdict. See

20  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

21      The Supreme Court has held "that the suppression by the prosecution of evidence

22  favorable to an accused upon request violates due process where the evidence is material either to

23  guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v.

24  Maryland, 373 U.S. 83, 87 (1963). See also Bailey v. Rae, 339 F.3d 1107, 1113 (9th Cir. 2003).

25  The duty to disclose such evidence is applicable even though there has been no request by the

26  accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and encompasses impeachment

29

1  evidence as well as exculpatory evidence.  United States v. Bagley, 473 U.S. 667, 676 (1985).  A

2  Brady violation may also occur when the government fails to turn over evidence that is "known

3  only to police investigators and not to the prosecutor."  Youngblood v. West Virginia, 547 U.S.

4  867, 870 (2006) (quoting Kyles v. Whitley, 514 U.S. 419, 438 (1995)).[7]  There are three

5  components of a Brady violation:  "[t]he evidence at issue must be favorable to the accused,

6  either because it is exculpatory, or because it is impeaching; the evidence must have been

7  suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

8  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  See also Banks v. Dretke, 540 U.S. 668, 691

9  (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005).

10         In order to establish prejudice in connection with a Brady violation, a petitioner must

11  demonstrate that "'there is a reasonable probability' that the result of the trial would have been

12  different if the suppressed documents had been disclosed to the defense."  Strickler, 527 U.S. at

13  289.  "The question is not whether petitioner would more likely than not have received a

14  different verdict with the evidence, but whether "in its absence he received a fair trial, understood

15  as a trial resulting in a verdict worthy of confidence."  (Id.) (quoting Kyles, 514 U.S. at 434).  See

16  also Silva, 416 F.3d at 986 ("a Brady violation is established where 'the favorable evidence could

17  reasonably be taken to put the whole case in such a different light as to undermine confidence in

18  the verdict.'")  Once the materiality of the suppressed evidence is established, no further

19  harmless error analysis is required.  Kyles, 514 U.S. at 435-36; Silva, 416 F.3d at 986.  "When

20  the government has suppressed material evidence favorable to the defendant, the conviction must

21  be set aside."  Silva, 416 F.3d at 986.

22         Here, petitioner cannot demonstrate the presence of a single required element of a

23  Brady violation entitling him to federal habeas relief, let alone the necessary three.  Petitioner

24

25         [7] "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the
26  others acting on the government's behalf in the case, including the police."  Kyles v. Whitley,
514 U.S. 419, 437 (1995).

1   claims that "[a]t the in limine motions the day before the trial began, defense requested the

2   discovery but the judge denied the motion." (Am. Pet. at 11-12.)  In his traverse, petitioner

3   provides further details regarding this claim, explaining:

> Petitioner requested of his first appointed attorney, Mr. Rooney, to get
> copies of all the notebooks in discovery.  He refused.  So petitioner then
> submitted a written request directly of the District Attorney.  It was
> requested that [the] prosecution produce for defendant all writings seized.
> This written request was made on August 12, 2002, a year and a half
> before trial.  It was done pursuant to California Penal Code § 1054.1.
>
> Petitioner Marsdened Mr. Rooney and was appointed another attorney, Mr.
> Reynolds.[8]  This attorney also refused to advocate defendant's written
> request for discovery.  But he did procure a copy of one more notebook,
> one which the prosecutor dubbed the "alibi journal."
>
> After some fourteen months petitioner Marsdened Mr. Reynolds and was
> appointed Mr. Allan Dollison.  This attorney became trial counsel and
> didn't have time to deal with these undiscovered journals until the day
> before trial.
>
>                           * * *
>
> The prosecuting attorney willfully withheld exculpatory evidence,
> deliberately waiting until the last minute to inform defense he would use
> these notebooks to impeach witness testimony about the defendant's
> character.
>
> A discussion ensued between the prosecuting attorney, defense counsel,
> and the court the day before trial incidental to in limine [motions].  A few
> days prior to this discussion defense counsel gave the prosecutor a list of
> five potential character witnesses.  Prosecution at that time told counsel
> that it would introduce evidence from the never discovered journals.

19   (Traverse at 41-42.)

20         While petitioner argues that his journals were "exculpatory" he fails to cite a single

21   example of their exculpatory nature.  To the contrary, petitioner's journals not only explicitly,

22   graphically, and conclusively detailed his commission of the crimes charged against him, they

23   also referenced unrelated sexual fantasies involving underage girls, as well as inappropriate

24   sexual conduct with his daughter.  (RT at 357-59.)  Petitioner has therefore failed to establish that

---

26      [8]  Under California law a defendant may move to relieve his appointed trial counsel
pursuant to the decision in People v. Marsden, 2 Cal.3d 118 (Cal. 1970).

1  the journals contained any exculpatory evidence or impeachment evidence applicable to anyone

2  other than petitioner.

3          Moreover, the journals were not suppressed by the prosecution.  As petitioner

4  explained, neither his first or second appointed counsel sought copies of all of petitioner's

5  voluminous journals through discovery, although both defense counsel were aware of their

6  existence.  Petitioner's third appointed counsel did request copies of all the journals, many of

7  which were written before petitioner knew the victim and dated back to 1973, on the eve of trial,

8  after the prosecution indicated an intent to use some of petitioner's journal entries to impeach the

9  character witnesses belatedly disclosed by the defense.  (Id. at 353-55.)  As noted above, that

10  discovery motion was denied by the court as untimely.  Regardless, as the prosecutor noted

11  during pretrial motions argument, petitioner's trial counsel could have inspected the journals at

12  any time in the sheriff's office by making an appointment to do so.  (Id. at 360, 412-13, 422-23.)

13  Moreover, petitioner was the author of his journals and therefore was obviously aware of their

14  content.  Where a defendant is aware of the evidence allegedly being withheld, the prosecution

15  cannot be found to have suppressed the evidence.  See Raley v. Ylst, 470 F.3d 792, 804 (9th Cir.

16  2006), cert. denied, 552 U.S. 833 (2007) (holding that, where "[p]etitioner possessed the salient

17  facts regarding the existence of the records that he claims were withheld," his "trial counsel

18  could have sought the documents through discovery"); United States v. Aichele, 941 F.2d 761,

19  764 (9th Cir. 1991) (where defendant has enough information to be able to ascertain the

20  supposed Brady material on his own, there is no suppression).

21          Finally, even assuming arguendo that the prosecution had suppressed some of

22  petitioner's journals and that they did contain potentially exculpatory information, petitioner has

23  not even alleged, let alone demonstrated, that he suffered any prejudice as a result.  Petitioner

24  does not address in any manner how there is a reasonable probability that the result of the trial

25  would have been different if he only had copies of every one of the sixty journal which he had

26  authored.

1    Turning to petitioner's argument concerning the prosecutor's rebuttal argument, in

2  considering claims of prosecutorial misconduct involving allegations of improper argument the

3  court is to examine the likely effect of the statements in the context in which they were made and

4  determine whether they so infected the trial with unfairness as to make the resulting conviction a

5  denial of due process.  Turner v. Calderon, 281 F.3d 851, 868 (9th Cir. 2002); Sandoval v.

6  Calderon, 241 F.3d 765, 778 (9th Cir. 2001); see also Donnelly v. DeChristoforo, 416 U.S. 637,

7  643 (1974); Darden, 477 U.S. at 181-83.  In fashioning closing arguments, prosecutors are

8  allowed "reasonably wide latitude," United States v. Birges, 723 F.2d 666, 671-72 (9th Cir.

9  1984), and are free to argue "reasonable inferences from the evidence."  United States v. Gray,

10  876 F.2d 1411, 1417 (9th Cir. 1989).  See also Ducket v. Godinez, 67 F.3d 734, 742 (9th Cir.

11  1995).  "[Prosecutors] may strike 'hard blows,' based upon the testimony and its inferences,

12  although they may not, of course, employ argument which could be fairly characterized as foul or

13  unfair."  United States v. Gorostiza, 468 F.2d 915, 916 (9th Cir. 1972).

14    After reviewing the record, the undersigned concludes that petitioner has failed to

15  demonstrate any prejudice with respect to his claim of prosecutorial misconduct with respect to

16  the prosecutor's rebuttal argument in this case.  Following trial petitioner's counsel made a

17  motion for a new trial arguing, in part, that the prosecutor had engaged in a "violent outburst

18  during the closing argument" that was "designed solely for the purpose of swaying the passion

19  and prejudice of the jury."  (RT at 971-72.)  The prosecutor disputed defense counsel's

20  characterization of his rebuttal argument, stating, "What I did was I went to evidence and took a

21  manzanita club that had been entered into evidence and I brought it down hard twice on a book

22  that was on counsel table."  (Id. at 975.)  The deputy district attorney asserted that his use of the

23  manzanita club in his argument was supported by the evidence.  (Id. at 975-76.)

24    The trial judge agreed, denying the motion for a new trial and ruling as follows:

25    Motion for a new trial is denied.  Regarding [the prosecutor's] striking the
books during the argument, it's my recollection that his striking those
26    books was completely consistent with the information in the journals

33

1
> written by the defendant as to how many times he struck the victim and
> had he misrepresented himself in that respect, I would have climbed all
> over him for misrepresenting himself to the jury.

2

3 (Id. at 991-92.)

4   The prosecutor's use of the manzanita stick to strike a book while arguing that the

5 petitioner had repeatedly struck the victim in the head, appears to be a reasonable argument based

6 on the evidence introduced at petitioner's trial.  "It is not misconduct for the prosecutor to argue

7 reasonable inferences based on the record." United States v. Younger, 398 F.3d 1179, 1190 (9th

8 Cir. 2005) (quoting United States v. Cabrera, 201 F.3d 1243, 1250 (9th Cir. 2000)).  Moreover,

9 the possible impact of the prosecutor's striking of the book with the stick during his rebuttal

10 argument is disproportionately minor in comparison to the overwhelming evidence of petitioner's

11 guilt and cannot be said to have infected the trial with unfairness so as to make the resulting

12 conviction a denial of due process.

13   Accordingly, for the reasons stated above, petitioner is not entitled to federal habeas

14 relief with respect to his Brady/prosecutorial misconduct claim.

15   G.  Ineffective Assistance of Appellate Counsel

16   Petitioner's next claim is that his appellate counsel rendered ineffective assistance.  In

17 this regard petitioner argues his appellate counsel was ineffective for two reason: (1) for failing

18 to raise, or properly argue, on appeal the arguments petitioner asserts in the petition pending

19 before this court (violation of vicinage rights, ineffective assistance of trial counsel,

20 inadmissibility of petitioner's journals, prosecutorial misconduct and the insufficiency of the

21 evidence); and (2) for failing to request reporter's transcripts of the parties opening arguments at

22 trial.  (Am. Pet. at 12-13.)

23   The last reasoned state court decision as to this claim is from the Amador County

24 Superior Court.  That court rejected this claim finding that petitioner had "failed to demonstrate

25 prejudice, as a result of any alleged ineffective assistance of counsel." (Lod. Doc. 10 at 3.)

26 /////

34

1    The Strickland standards apply to appellate counsel as well as trial counsel. Smith v.

2    Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

3    However, an indigent defendant "does not have a constitutional right to compel appointed

4    counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

5    professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751

6    (1983).  Counsel "must be allowed to decide what issues are to be pressed." Id.  Otherwise, the

7    ability of counsel to present the client's case in accord with counsel's professional evaluation

8    would be "seriously undermined." Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

9    Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

10   not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

11   meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

12   showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

13   to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

14   context, petitioner must show that, but for appellate counsel's errors, he probably would have

15   prevailed on appeal.  Id. at 1434 n. 9

16   For the reasons set forth above, this court has not found merit in any of petitioner's

17   claims.  Had petitioner's appellate counsel raised those claims on appeal they would likely have

18   been rejected as meritless.  Petitioner has not shown otherwise.  Of course, petitioner's appellate

19   counsel had no obligation to raise meritless issues on appeal.  Strickland, 466 U.S. at 687-88.

20   Accordingly, petitioner has not demonstrated that, but for his appellate counsel's alleged errors,

21   he probably would have prevailed on appeal.  Therefore, he is not entitled to federal habeas relief

22   with respect to this aspect of his ineffective assistance of appellate counsel claim.

23   Regarding petitioner's claim that his appellate counsel failed to request transcripts of

24   opening arguments, petitioner merely argues that "if" his trial counsel "promised to prove

25   anything in petitioner's defense and then failed to do so he could be held for ineffective

26   assistance of counsel; or at least it should have been argued."  (Am. Pet. at 13.)

1    Petitioner's argument that "if" his trial counsel promised in opening argument to the

2    jury to prove something and then failed to do so, he could be found to have provided ineffective

3    assistance is obviously speculative.  Petitioner has certainly presented no evidence to support

4    such speculation.  Indeed, petitioner concedes in his traverse that "it might be only speculation"

5    but argues that nevertheless "appellate counsel should have recognized a duty to explore the

6    matter."  (Traverse at 50.)  Such a mere possibility is obviously insufficient to establish

7    prejudice.  See Cooks v. Spalding, 660 F.2d 738, 740 (9th Cir. 1981) (mere speculation is

8    insufficient to demonstrate prejudice).  Accordingly, petitioner is not entitled to federal habeas

9    relief on this aspect of his ineffective assistance of appellate counsel claim.

10    H.  Sentencing

11    Petitioner asserts that the he was improperly sentenced to the upper term of thirteen

12    years with respect to his conviction for kidnapping.  (Am. Pet. at 14.)  He contends that the

13    sentence was imposed based on facts not found true by the jury.  (Id.)  Petitioner also argues that

14    in imposing consecutive sentences the sentencing judge was required to "make[] this choice after

15    finding additional facts."  (Id.)

16    Petitioner was sentenced to the upper term applicable to the kidnapping conviction,

17    with the sentencing judge stating:

18    With regard to the indeterminate sentence crimes: It's the judgment of this
     Court that in punishment for the felony offense of kidnapping, a violation
19    of Section 207(a) of the Penal Code, which shall be the base term under
     this determinate sentencing scheme, the Court is going to impose the upper
20    term of eight years in the State prison because the aggravating
     circumstances substantially outweigh the mitigating ones.

21
     To wit: The crime involved a great degree of cruelty, viciousness and
22    callousness.  The crime was particularly vicious and brutal.  The crime
     indicates planning.  The defendant and the victim were friends living
23    together.

24    The victim was particularly vulnerable and the defendant's violent conduct
     indicates a serious danger to society.

25
     The only mitigating factor that I can find is the lack of a prior criminal
26    record of the defendant.  Although the defendant stated remorse in his

36

1   letter to the Probation Office, I question the validity of that statement.

2   The upper term that the Court is imposing for that sentence is eight years
    in State Prison.

3

4   (RT at 1013-14.)

5       The Amador County Superior Court issued the last reasoned decision by a state court

6   in response to this claim.  That court specifically rejected petitioner's argument in its October 15,

7   2007, order denying habeas relief to petitioner.  Therein, the Superior Court reasoned as follows:

8       Petitioner contends his Sixth Amendment rights were violated when the
        facts relied upon [by] the trial judge in imposing an aggravated term of
9       imprisonment were not determined by the jury.  Respondent does not
        dispute the petitioner has demonstrated error, pursuant to Cunningham v.
10      California (2007) 127 S. Ct. 856.  However, Respondent contends the
        sentencing error has harmless beyond a reasonable doubt.  Thus, the only
11      issue before the Court is whether Petitioner is entitled to resentencing,
        pursuant to Cunningham, supra.

12                                    * * *

13

14      The California Supreme Court addressed the issue of the appropriate
        remedy for Cunningham violations in People v. Sandoval (2007) 41
15      Cal.4th 825.  In that case, the Court held the denial of the right to a jury
        trial on aggravated circumstances is reviewed by the harmless error
16      analysis.  (id. at 597.)  The Court further opined:

17          If a reviewing court concludes, beyond a reasonable doubt,
            that the jury, applying the beyond-a-reasonable-doubt
18          standard, unquestionably would have found true at least a
            single aggravating circumstance had it been submitted to
19          the jury, the Sixth Amendment error may properly be found
            harmless.  (id. at 598 (emphasis in original).)

20

21      In this instance, the trial court found the following aggravating
        circumstances:

22          The crime involved a great degree of cruelty, viciousness
            and callousness.  The crime was particularly vicious and
23          brutal.  The crime indicates planning.  The defendant and
            the victim were friends and living together.  The victim was
24          particularly vulnerable and the defendant's violent conduct
            indicates a serious danger to society.  (Reporter's Transcript
25          dated March 1, 2004, 45:22-46:3.)

26   /////

                                    37

1

2          Based upon the evidence presented at trial, the court finds that beyond a
           reasonable doubt, the jury would have found at least a single aggravating
3          circumstance true and, therefore, any error was harmless.  The victim was
           intoxicated and sleeping in the motor home he shared with the petitioner
           when the petitioner attacked him.  As indicated by the petitioner's diaries,
4          he was planning the attack on the victim for some time prior thereto.
           Petitioner dumped the victim along the side of the highway.

5    (Lod. Doc. 13 at 1-2.)

6          The United States Supreme Court held as a matter of constitutional law that, other

7    than the fact of a prior conviction, "any fact that increases the penalty for a crime beyond the

8    prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

9    doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).  In Blakely v. Washington, 542 U.S.

10   296, 303 (2004), the Supreme Court held that the "statutory maximum for Apprendi purposes is

11   the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury

12   verdict or admitted by the defendant."

13         In People v. Black, 35 Cal.4th 1238 (2005) ("Black I"), the California Supreme Court

14   held that California's statutory scheme providing for the imposition of an upper term sentence

15   did not violate the constitutional principles set forth in Apprendi and Blakely.  The court in Black

16   I reasoned that the discretion afforded to a sentencing judge in choosing a lower, middle or upper

17   term rendered the upper term under California law the "statutory maximum."  Black I, 35 Cal.4th

18   at 1257-61.  However, in Cunningham v. California, 549 U.S. 270 (2007), the United States

19   Supreme Court held that a California judge's imposition of an upper term sentence based on facts

20   found by the judge (other than the fact of a prior conviction) violated the constitutional principles

21   set forth in Apprendi and Blakely.  In this regard, the United States Supreme Court expressly

22   disapproved the holding and the reasoning of Black I, finding that the middle term in California's

23   determinate sentencing law was the relevant statutory maximum for purposes of applying the

24   principles announced in Blakely and Apprendi.  Cunningham, 549 U.S. at 291-94.[9]

25   _____

26         [9] The Ninth Circuit subsequently held that the decision in Cunningham may be applied
     retroactively on collateral review.  Butler v. Curry, 528 F.3d 624, 639 (9th Cir. 2008).

1     In light of its decision in <u>Cunningham</u>, the United States Supreme Court vacated

2  <u>Black I</u> and remanded that case to the California Supreme Court for further consideration.  <u>See</u>

3  <u>Black v. California</u>, 549 U.S. 1190 (2007).  On remand, the California Supreme Court held that:

4           so long as a defendant is eligible for the upper term by virtue of facts that
            have been established consistently with Sixth Amendment principles, the
5           federal Constitution permits the trial court to rely upon any number of
            aggravating circumstances in exercising its discretion to select the
6           appropriate term by balancing aggravating and mitigating circumstances,
            regardless of whether the facts underlying those circumstances have been
7           found to be true by a jury.

8  <u>People v. Black</u>, 41 Cal.4th 799, 813 (2007) ("<u>Black II</u>").  In other words, the California Supreme

9  Court found that as long as one aggravating circumstance has been established in a constitutional

10 manner, a defendant's upper term sentence withstands Sixth Amendment challenge.  Thereafter,

11 relying on the California Supreme Court's decision in <u>Black II</u>, the Ninth Circuit Court of

12 Appeals has confirmed that, under California law, only one aggravating factor is necessary to

13 authorize an upper term sentence.  <u>Butler v. Curry</u>, 528 F.3d 624, 641-43 (9th Cir.), <u>cert.</u> <u>denied</u>

14 ___U.S.___, 129 S. Ct. 767 (2008).

15     Even if, however, none of the aggravating factors on which a judge relies in

16 sentencing a defendant to an upper term sentence is established in a manner consistent with the

17 Sixth Amendment, reversal would not be required if the error was harmless.  <u>Washington v.</u>

18 <u>Recuenco</u>, 548 U.S. 212, 221-22 (2006) (sentencing errors subject to harmless error analysis);

19 <u>see</u> <u>also</u> <u>Butler</u>, 528 F.3d at 648 (harmless error standard under <u>Brecht v. Abrahamson</u>, 507 U.S.

20 619 (1993), will prevent the granting of relief unless the error had a "substantial and injurious

21 effect" on a defendant's sentence)).  Thus, to grant federal habeas relief in a case involving a

22 constitutional error in the imposition of an upper term sentence under California law, the federal

23 court must have "grave doubt" as to whether a jury would have found the relevant aggravating

24 factor beyond a reasonable doubt.  <u>Butler</u>, 528 F.3d at 648.  "Grave doubt" exists "when, in the

25 judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the

26 harmlessness of the error."  <u>O'Neal v. McAninch</u>, 513 U.S. 432, 435 (1995).  <u>See</u> <u>also</u> <u>Butler</u>,

1  528 F.3d at 648; <u>Baker v. Kramer</u>, No. 2:07-cv-1170-JAM-JFM (HC), 2010 WL 3057757, at *23

2  (E.D. Cal. Aug. 3, 2010) ("[B]ecause the trial judge could have legally imposed the upper term

3  solely for the existence of petitioner's prior adult convictions, petitioner's aggravated sentence

4  . . . is not unconstitutional.")

5           Here, the jury was presented with petitioner's own writings which reflected that he

6  had planned the attack on the victim.  The jury heard in petitioner's own written words how he

7  had taken the manzanita club and "smashed [the victim's] skull with" it while he was sleeping

8  and "cracked [the victim] several times."  (RT 686-87.)  Petitioner described how the victim

9  lived through the assault and "moaned and grunted continuously."  (<u>Id.</u> at 687.)  Petitioner's

10  writings detailed how he passively listened to the victim as he was "moaning and struggling to

11  get up, but didn't have the strength or coordination." (<u>Id.</u> at 688.)  Petitioner characterized his

12  own actions as "brutal, and the meanest, coldest thing [he had] ever done."  (<u>Id.</u> at 686.)  The jury

13  also heard the written description of how after the brutal attack petitioner stole the victim's

14  money and truck, while transporting the body to another location to dump it.

15           In light of this evidence, the undersigned does not have "grave doubt" as to whether a

16  jury would have found that petitioner's crime involved the aggravating factors (the crime

17  involved a great degree of cruelty, viciousness and callousness, the victim was particularly

18  vulnerable, the manner the crime was carried out indicates planning, and the defendant's violent

19  conduct indicates a serious danger to society) cited by the sentencing court beyond a reasonable

20  doubt.  <u>See</u> Cal. Rules of Court, Rule 4.421.

21           Turning to petitioner's claim that consecutive sentences were impermissibly imposed,

22  the United States Supreme Court has reviewed precisely the issue presented here by petitioner,

23  that is whether, "[w]hen a defendant has been tried and convicted of multiple offenses, each

24  involving discrete sentencing prescriptions, does the Sixth Amendment mandate jury

25  determination of any fact declared necessary to the imposition of consecutive, in lieu of

26  concurrent, sentences?"  <u>Oregon v. Ice</u>, ___U.S.___, 129 S. Ct. 711, 714 (2009).  The court held

1   that the Sixth Amendment does not so require, because determination of facts underlying a

2   consecutive sentence lies outside the historical province of the jury and because no "impelling

3   reason" counsels in favor of abrogating the states' interest in providing rules to guide courts in

4   making such determinations.  129 S. Ct. at 717-19.

5          For these reasons, the rejection of this claim by the California courts was neither

6   contrary to, nor an unreasonable application of clearly established federal law.  Accordingly,

7   petitioner is not entitled to federal habeas relief on his claim of sentencing error.

8                                            CONCLUSION

9          For the reasons set forth above, IT IS HEREBY RECOMMENDED that petitioner's

10  amended application for a writ of habeas corpus (Doc. No. 5) be denied.

11         These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

13  one days after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16  shall be served and filed within seven days after service of the objections.  Failure to file

17  objections within the specified time may waive the right to appeal the District Court's order.

18  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

19  1991).  In any objections he elects to file petitioner may address whether a certificate of

20  appealability should issue in the event he elects to file an appeal from the judgment in this case.

21  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a

22  certificate of appealability when it enters a final order adverse to the applicant).

23  DATED: October 30, 2010.

24

25  _____

26  DAD:6                              DALE A. DROZD
    germino3010.hc                     UNITED STATES MAGISTRATE JUDGE

                                          41